No. 38,396

STATE OF KANSAS, *Appellee,* v. RUSSELL G. KLADIS, *Appellant.*

(238 P. 2d 522)

Filed December 8, 1951.

*W. C. Jones,* of Olathe, argued the cause, and *Maurice R. Hubbard,* also of Olathe, was with him on the briefs for the appellant.

*John Anderson, Jr.,* county attorney, argued the cause, and *Harold F. Fatzer,* attorney general, was with him on the briefs for the appellee.

The opinion of the court was delivered by

PRICE, J.: Here the defendant was charged with burglary and larceny of a grocery store in Overland Park. He was acquitted of the larceny charge but convicted of burglary, and has appealed.

The state's evidence established substantially the following:

The witness Rauch, employed as a truck driver for the store, stopped to service it at approximately midnight on August 2, 1949. The store was brilliantly lighted at the time. The rear door was open and "pushed right on in." As he entered the rear storeroom a man that "didn't have any shirt on" ran out of the meat department, past the witness and into the darkness. Rauch immediately notified the sheriff's office at Mission. Stevenson, the officer on duty, testified that about 12:08 a. m., in response to such a call, he dispatched a patrol car to the store.

Witness Stevenson further testified that about 12:50 a. m. he re-

ceived a telephone call from a woman who said her name was Kladis, at 8601 Woodward, and told him that "someone is breaking in the house," and that a minute or minute and a half later the same party called back, giving the same name and address and said "cancel the call, that it was her husband coming home." On cross-examination he testified that he did not know Mrs. Kladis, wife of defendant, had never talked to her on the telephone before or since; that he had never heard the voice before; did not later verify the number given to him as belonging to Mrs. Kladis; and that he did not know whether the two calls were made from the same place or that they were made from 8601 Woodward, or whether they were made from defendant's residence.

In response to Stevenson's action in dispatching a patrol car, officers arrived at the store within a few minutes. One of them, Burger, testified that he talked to Rauch, the truck driver, and that he, Burger, saw a 1949 Ford car parked across the street from the store. The keys to it were still in the ignition switch and included "a trunk key for the rear of the car and what I presumed to be a door key." Investigation via radio with the sheriff's office established that the car license had been issued to Kladis, the defendant. An ax, bumper jack and a hacksaw frame were found in the car; also a man's shirt in the back seat. A steel casement window in the back of the store had been broken out and one of the crossbars had hacksaw marks. Officer Burger was unable to find the Kladis residence and enlisted the aid of one Holland, who resided in the vicinity, to assist him. Burger, together with other officers and Holland, went to the Kladis home at 8601 Woodward at about 1:00 o'clock a. m. Mrs. Kladis came to the door. Upon observing there was no car in the driveway, she asked, "Where is our car?" Burger inquired for Mr. Kladis, who, upon being called by his wife, appeared. Apparently there was some conversation concerning his whereabouts during the evening, and he told the officers where he had been up until 9:00 o'clock of the evening before. Upon being asked if he owned a 1949 Ford he replied that he did but that he did not know where it was. He then requested that the officers bring his car home or leave it where it was until the next morning. The officers then placed him under arrest and took him to the store. Rauch was still there and identified defendant as being the man "that ran out of the store." Defendant had a cut on his hand at the time of his arrest.

The manager of the store arrived at the scene about 2:00 o'clock a. m., and he testified as to finding blood on the floor of the washroom and on the cash register and meat counter; that a steel knob had been knocked from the door of the safe; that he found a part of a hacksaw blade under the window that was broken out; that the cash register showed a loss of $12.87, and that he saw splotches of blood on the ground near a building immediately north of the store.

The sheriff testified that on the next afternoon he and officer Burger brought defendant before the county attorney, at which time the four of them discussed the night's events. According to this witness, the county attorney advised defendant of his rights, whereupon defendant made some sort of a proposition in which he inquired if it would be possible for him to receive a parole—assuming that he would admit his guilt and tell how it all took place due to the fact he had a few too many drinks the night before on account of being worried over business conditions; that the county attorney advised him that he could not offer any promises and that such matters rested entirely with the court. It further appears that during this conversation the sheriff said something to the effect that it would cost him (the defendant) " a lot of money to fight it and would be taking food out of his babes' mouth."

The sheriff also testified as to a search he made of defendant's home but that he found nothing which had been taken from the store; and, further, that in the glove compartment of defendant's car was found a billfold containing $100. It was not contended that this money was stolen from the store.

The county physician testified that in the afternoon following the alleged burglary he examined the defendant and cleansed and treated a laceration on the palm of his hand which bled rather profusely. He further testified that during his examination of defendant he noticed a number of scratches and cuts on his shoulders, chest and arms, obviously the result of contact with a very sharp object, and that they could have been produced by sharp pieces of glass.

In behalf of defendant, a banker of Overland Park testified that on the day before the alleged burglary and larceny defendant had made a deposit of $600 in his bank; that defendant had always carried a satisfactory account with the bank, both savings and checking account; and that several years previous defendant had obtained a loan from the bank in which diamonds appraised at from $3,000 to $4,000 were put up as collateral.

Another witness, a real-estate broker in Overland Park, testified that defendant had purchased two houses from her; that he did not owe her any payments on the home in which he was then living; that he had always met his obligations, and that his reputation in the community for honesty and integrity was good.

A third witness testified as to defendant's good reputation in the community, and that even after his arrest the people in the community still had the same high opinion of him.

The witness Holland, whose assistance in locating the Kladis residence was sought by officer Burger and who went with the officers to defendant's home, testified that when the officers knocked on the door Mrs. Kladis answered and the officers inquired if Mr. Kladis was home; that she replied: "Just a minute, I will call him." That defendant came to the door and wanted to know "what was going on"; that he, the witness, followed in his car when the officers took defendant to the store that night, and that when the truck driver Rauch looked at defendant he, Rauch, said: "It looks like the man," and that Rauch did not positively identify defendant on that occasion. He further testified that about a day and a half after the night in question he examined defendant for any cuts or scratches on his body and found none.

The defendant testified in his own behalf, and a summary of his testimony is as follows:

He was thirty-five years of age, and after serving in World War II had returned to his former home in Minneapolis, Minn., as a salesman. Later he came to Kansas City as an assistant plant manager of a bakery company. He resigned this position to enter business for himself, with three partners. This latter business was large production of bakery pies. He was married and had brought his six-year-old daughter home from the hospital on the day before the alleged burglary; that after bringing his daughter home he went to his place of business in an industrial section of Kansas City, Mo., to uncrate some machinery; that he placed his billfold in the glove compartment of his car for safety while working; that he worked there until about 9:30 that evening and returned to his home in Overland Park about half an hour later; that on account of garden tools and household goods occupying space in his garage he parked his car in the driveway and did not remove the car keys. After inquiring about his sick child he had something to eat, discussed his business with his wife and went to bed. He denied all charges against him; denied that he had entered the store in ques-

tion, and maintained that he had been at home in bed until awakened in the early morning hours by his wife, after the officers arrived. He testified that he inquired of them as to the whereabouts of his car after he looked out at the driveway and did not see it, and that he accompanied the officers to the grocery store, at which place he was told to remove his hat, and that a man who was a stranger to him said, "I think that is the man," and that he was then taken to jail in Olathe, despite his request to be permitted to remain at home with his wife and sick child, and that he remained in jail until the next afternoon.

His version of the conversation with the officers and county attorney was that he was led to believe "that he didn't have a chance"; that it would be foolish for him to hire counsel as all he would be doing would be taking bread and butter out of his family's mouths. He further testified that the officers "insisted" his hand be treated for a slight cut which, according to him, he had received the day before while working on a stone patio in his backyard, and that a "huge" bandage was placed upon this small cut. He admitted that the shirt found in the car belonged to him and stated that he had taken it off while working at his place of business and placed it in the back seat of the car. He further testified that at the time of his arrest he had several hundred dollars in a bank account and was in no financial difficulties.

Defendant complains of numerous alleged trial errors, one of them being misconduct on the part of the county attorney in refusing to make available to defendant certain fingerprint evidence at the preliminary hearing. This complaint is without merit if for no other reason than that neither the state nor defendant called the witness in question on the trial of the case.

Another complaint is that the court permitted the county attorney to amend the information after the trial commenced, without reverifying or refiling the same. The facts concerning this need not be detailed. We have examined them. The words of the amendment were included in the original information but were inadvertently omitted when it was redrawn pursuant to defendant's request for more particularity as to another matter. The amendment was merely as to form, permitted by G. S. 1949, 62-808, did not change the issues, and defendant was in no way prejudiced. (State v. Radke, 168 Kan. 334, 212 P. 2d 296.)

Complaint is also made of the court's refusal to give two instructions requested by defendant on circumstantial evidence and evi-

dence of previous good character. They, together with those given by the court, need not be set out. We have examined them and in our opinion the court correctly and fully instructed the jury on both matters.

Another and more serious question, however, is raised by defendant in his contention that the court erred in admitting the testimony of the witness Stevenson concerning the two telephone calls he received from the woman who said her name was Kladis at 8601 Woodward. This evidence was strenuously objected to and defendant contends that in the absence of a positive identification of the party calling it was clearly hearsay and therefore incompetent and inadmissible, and was highly prejudicial.

As a broad general rule it is of course true that in order for a telephone conversation to be admissible in evidence identity of the party on the other end of the line must be satisfactorily established. Identification may be by direct evidence or by facts and circumstances. (Underhill's Criminal Evidence, 4th Ed. § 129, p. 177.) The completeness of the identification goes to the weight of the evidence rather than to its admissibility. (*The State v. Nixon,* 111 Kan. 601, 207 Pac. 854.)

The theory of the state's case was that defendant drove his car to the store and parked it; was caught in the act of burglarizing the store by Rauch, the truck driver; ran or otherwise got to his home, leaving the car at the scene with the keys, including his house key, in it, and thus was compelled to force his way into his home and at the same time keep his wife in the dark as to his actions and whereabouts. We are advised that defendant's home at 8601 Woodward is less than a mile and a half from the store. It is to be remembered that Rauch intercepted the alleged burglar at or about midnight. At 12:08 a. m. Stevenson dispatched a patrol car to the scene. At 12:50 a. m. he received the first of the two calls from the woman who said her name was Kladis at 8601 Woodward. In the meantime the officers were searching the store and car for clues and attempting to find the residence of the owner of the car. They did not go to defendant's home as a result of the two telephone calls in question. The record is silent concerning whether Mrs. Kladis said anything to them at the time about having called Stevenson a short time before. She did not testify at the trial. We are told that she collapsed in the courtroom. It does not appear that defendant requested any continuance so as to make her available as a witness.

Despite Stevenson's admission that he was not familiar with Mrs. Kladis' voice, and that he had not talked to her before or since, we think that in view of all the other facts and circumstances established by the evidence the court did not err in permitting him to testify concerning the two telephone calls. The calls themselves are not to be isolated from the other circumstances. On each occasion the party gave her name as Kladis and her address as 8601 Woodward. Defendant and his wife lived at that address. He was found there. There were many other items of evidence which, if believed by the jury, pointed to the guilt of defendant, among them being the identification by Rauch, the blood found in and around the store and the cut on defendant's hand, his shirt and the hacksaw frame found in the car, the presence of the car itself, and the statements by defendant in the nature of an admission against interest. There is, of course, the possibility that someone stole defendant's car from his driveway, burglarized the store and then had a woman companion call the sheriff's office at Mission giving the name Kladis and the address as 8601 Woodward, but we have no doubt that all of those things were argued to the jury. The testimony of Stevenson concerning these calls was undoubtedly damaging to the defense, but such fact is not the test of competency or admissibility. We think that under all of the facts and circumstances the admission of this testimony was not erroneous.

Defendant also assigns as error the rulings of the court below in denying his motion for a directed verdict and his motion for a new trial. Clearly there was sufficient evidence to sustain the verdict of the jury finding defendant guilty of the charge of burglary, and, there being no reversible error in the record, the motion for a new trial was properly overruled.

The judgment of the lower court is therefore affirmed.

SMITH, PARKER and WERTZ, JJ., dissent from subdivision 3 of paragraph 2 of the syllabus and the corresponding portion of the opinion, and are of the opinion that a new trial should be granted.