**KANSAS ELECTRIC SUPPLY COM-
PANY, Inc., a Kansas Corpora-
tion, Plaintiff-Appellee,**

v.

**DUN AND BRADSTREET, INC., a Dela-
ware Corporation, Defendant-
Appellant.**

No. 315–70.

United States Court of Appeals,
Tenth Circuit.

Sept. 20, 1971.

J. A. Dickinson, Topeka, Kan. (Ralph E. Skoog of Dickinson, Crow & Skoog, Topeka, Kan., on the brief), for plaintiff-appellee.

Charles F. G. Raikes (Ralph W. Oman, James L. Grimes, Jr., of Cosgrove, Webb & Oman, and James E. Smith, Topeka, Kan., on the brief), for defendant-appellant.

Before CLARK *, Associate Justice, and HILL and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a libel case which bears considerable resemblance to Grove v. Dun & Bradstreet, Inc., 438 F.2d 433 (3d Cir. 1971), to which there will be subsequent reference. Kansas Electric Supply Company, Inc., a wholesale electric supply company hereinafter referred to as the plaintiff, brought an action for libel per se against Dun & Bradstreet, hereinafter referred to as D & B, for compensatory and punitive damages resulting from a false subscriber's report circulated by D & B to the effect that plaintiff was in bankruptcy. Upon trial the jury returned a verdict in favor of the plaintiff and fixed compensatory damages at $100,000 and assessed punitive damages in the sum of $50,000. Judgments in accord with the jury's verdicts were thereafter duly entered and D & B now appeals.

On April 14, 1964, the plaintiff, along with two other creditors of the Dowling Electric Company, filed a petition in involuntary bankruptcy against Dowling in the United States District Court in Topeka, Kansas. On the afternoon of the same day an employee of D & B in checking court records came across the aforesaid petition. However, the employee misread the petition and understood it to be a petition filed by Dowling to put plaintiff in bankruptcy. The employee reported her erroneous findings in this regard to her supervisor and as a result thereof a pink-colored *Special Notice* was mailed the same day to proper subscribers of D & B stating that a petition in involuntary bankruptcy had been filed against the plaintiff. These are the basic facts out of which the present controversy emerges and further reference to the evidence will only be made where such relates to the various grounds here advanced by D & B as to why the judgment should be reversed.

Perhaps the major issue to be resolved is the applicability, if any, of the rule of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny, to the instant case.

* Associate Justice Retired, United States Supreme Court, sitting by designation.

D & B argues that *New York Times* does apply and that the trial court should have directed a verdict in its favor because of a total lack of proof of "actual malice" as required by and as defined in *New York Times*. Plaintiff, on the other hand, contends that the rule of *New York Times* does not apply to the instant case and that the case was properly tried under Kansas libel law.

█ This precise argument was explored in depth in Grove v. Dun & Bradstreet, Inc., *supra*. In that case a libel action against D & B was based on an erroneous subscriber's report that a confession judgment in the penal sum of $60,000 had been entered against the plaintiff, a Pennsylvania corporation engaged in the brokerage of bricks and tile. In holding that the trial court erred in setting aside a verdict in favor of the plaintiff in the amount of $110,-000 and entering judgment notwithstanding the verdict for D & B, the Third Circuit speaking through Judge Aldisert held that the doctrine of *New York Times* did not extend to private subscription credit reports and that alleged defamations resulting from such reports are properly subject to state libel law. In so holding that court declared: (1) The business or credit standing of the brick company was not a matter of "real public interest"; and (2) a publication of the type there under consideration which provides specialized information to a selective, finite audience is not a medium entitled to the extended constitutional protection provided by *New York Times* and its successor cases. In this particular connection we fully approve of the rationale of Grove v. Dun & Bradstreet, Inc., *supra*, and accordingly hold that the trial court did not err in its determination that the rule of *New York Times* does not govern the instant controversy.

█ Having determined that the *New York Times* doctrine does not apply, the next matter to be determined is whether the case was properly tried under Kansas libel law. Our examination of the record convinces us that it was. The jury was instructed that the credit reports of D & B were "conditionally privileged" and that the mere fact that the credit report under consideration was erroneous was not sufficient to justify the returning of a verdict for the plaintiff. Rather, according to the instructions, the plaintiff could not recover unless it established by a preponderance of the evidence that the erroneous report was issued with malice. The instructions then went on to define "malice" in accord with the Kansas law.[1] As concerns the instructions thus given, we

---

1. Instruction No. 9 reads as follows:

"You are instructed that you may find defendant was actuated by malice if, in issuing the special notice, defendant acted not in good faith but in bad faith toward plaintiff, and with an intent to injure plaintiff in its business, or in willful, wanton and reckless disregard of the rights and interests of plaintiff. If you find that the special notice was disseminated by defendant with malice, as that term is above defined, then the 'conditional privilege' is abused and not applicable, and you must find for plaintiff. The burden of proof is upon the plaintiff to establish by a preponderance of the evidence that defendant was actuated by malice as heretofore explained. While this is not a case in which liability of the defendant arises from proof of defendant's negligence, you may consider, among other facts in the evidence, whether the erroneous report given by defendant to its subscribers was a result of negligent investigation of the records of this Court in determining whether defendant acted in willful, wanton, and reckless disregard of the rights and interests of plaintiff."

Instruction No. 10 reads as follows:

"You are instructed that a willful, wanton, and reckless act is one indicating an intentional, reckless disregard and complete indifference and unconcern for the probable consequences of the act. Recklessness is an indifference to the rights of others and an indifference of whether wrong or injury is done.

"It is not necessary to prove that the defendant deliberately intended to injure the plaintiff. It is enough if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequence of this act was injury to the plaintiff."

find no such error as would entitle D & B to a new trial.

■ D & B further urges in this same general connection that even under the Kansas law on libel the case should not have gone to the jury because there was no proof that D & B acted with a wilful, wanton, and reckless disregard of plaintiff's interest. In other words, according to D & B, this is a case of an "honest mistake," and hence under either *New York Times* or Kansas libel law the trial court should have directed a verdict in its favor. We disagree. Our study of the record leads us to conclude that there was sufficient evidence to carry the case to the jury on the issue as to whether under all of the circumstances D & B acted in a wilful, wanton and reckless manner as concerns the plaintiff, which incidentally had itself been a long-time subscriber of D & B and which in the days immediately preceding the publication of the erroneous report had itself made repeated inquiry of D & B regarding the credit standing of Dowling. Additionally, in this same general regard plaintiff's net worth estimate had been placed at $300,000 to $500,000 and circulated as such by D & B over a substantial period of time prior to the report here in question. All things considered, the trial court did not err in refusing to direct a verdict for D & B.

■ As a part of its case, plaintiff called as its witness one A. E. Frickey, a Topeka businessman. The gist of his testimony was that on or about April 16, 1964 (two days after D & B disseminated its erroneous subscriber's report on plaintiff), he received a telephone call from a woman who identified herself as representing D & B; that the caller attempted to solicit his subscription to D & B and in the course of her sales talk inquired as to Frickey's various suppliers; and that when he mentioned plaintiff, she "wanted to know if I knew they were in bankruptcy." Frickey testified that prior to the telephone call here in question, he had received other calls of a similar nature

from one claiming to represent D & B and that D & B had in fact been "soliciting in that way for several years."

D & B objected to the admission of this testimony on the ground that there was insufficient foundation for its admission into evidence. The trial court overruled this objection and admitted the testimony in question. Additionally, by instruction the trial court advised the jury that such testimony was only to be considered in connection with the issue as to whether D & B had acted with malice towards the plaintiff. We find no error in the trial court's handling of this matter.

Concerning the necessity for authentication, C. McCormick, Law of Evidence 405–06 (1954), declares as follows:

> "If a witness testifies that he received a telephone call 'out of the blue,' and that the voice at the other end declared 'This is X calling,' followed by a message from the purported X, this is not a sufficient authentication of the message as coming from X. The needed link, however, will be supplied if the witness testifies that he recognized X's voice, or if the message reveals that the speaker had knowledge of facts that only X would be likely to know, or if other confirming circumstances make it probable that X was the speaker."

Opposing counsel agree on the general rule but disagree as concerns its application to the facts of the instant case. Both cite and rely on State v. Freeman, 195 Kan. 561, 408 P.2d 612 (1965), where it was held that testimony identifying the defendant in a criminal proceeding which is based, in part, upon recognition of the accused's voice is admissible. A case perhaps more in point is State v. Kladis, 172 Kan. 38, 238 P.2d 522 (1951), where the Kansas Supreme Court subscribed to the general rule that in order for a telephone conversation to be admissible in evidence the identity of the party on the other end of the line must be satisfactorily established by either direct or circumstantial evidence and in so holding that court observed that "[t]he

calls themselves are not to be isolated from the other circumstances." Other illustrative cases bearing on this particular point are N.L.R.B. v. Carpet, Linoleum and Resilient Tile Layers, 213 F.2d 49 (10th Cir. 1954); Gutowsky v. Halliburton Oil Well Cementing Co., 287 P.2d 204 (Okl.1955); and Texas Candy & Nut Co. v. Horton, Tex.Civ.App., 235 S.W.2d 518 (1950).

In the instant case the issue is not so much the identity, as such, of the caller but rather the authenticity of her claim to be representing D & B. However, resolution of the matter is still governed by the general rules above referred to. Proceeding to an analysis of the facts and circumstances surrounding the telephone call here under consideration, according to the witness Frickey this was not the first call he had received from one ostensibly representing D & B; rather he had received similar solicitation calls from D & B over a period of several years. The fact that there was this pattern of conduct rather than a single isolated call looks towards authenticity. Additionally, the nature of the conversation tended to identify and authenticate the call. In short, the facts and circumstances considered, the trial court did not err in admitting Frickey's testimony nor in its handling of the matter in its instructions to the jury. To have excluded this evidence would indeed have been "isolating" it from all the other circumstances of the case.

■ Finally, it is argued that the compensatory and punitive damages awarded by the jury are excessive, especially in light of the fact that the jury by special interrogatory found that plaintiff had suffered no special damages. All agree that the amount of damages is generally left to the discretion of the jury, unless, says D & B, the jury award be "shocking to the conscience of the court and obviously the result of passion or prejudice on the part of the jury." Lewis v. Montgomery Ward & Co., 144 Kan. 656, 62 P.2d 875 (1935). The trial judge was obviously not in anywise "shocked" by the size of the verdicts,

nor are we. As evidence of the former, the trial court in denying D & B's post-trial motions commented as follows:

"Defendant asserts that the verdict of the jury demonstrates passion and prejudice on the part of the jury. This Court could observe no indication of passion and prejudice. The verdict was large. It could have been much larger. The facts disclosed revealed a reckless disregard on the part of the defendant as to whether the statements in its communication were true * *."

■ Our review of the record convinces us that the trial judge was correct in his appraisal of this matter. There was evidence that during the years immediately following the circulation by D & B of the false report the wholesale electric supply business in general experienced a steady growth, whereas for the same years plaintiff's volume of business experienced a steep decline. And the state of the record is such that the jury could justifiably conclude that the cause of this decline was the action of D & B. As concerns instructions, the jury was instructed in accord with Kansas law that compensatory damages may be either general or special in nature and that general damages are those damages which actually and necessarily flow as a natural result of the wrongful act and included, among other things, such injuries as "impairment of reputation and public humiliation." See in this regard M. F. Patterson Dental Supply Company v. Wadley, 401 F.2d 167 (10th Cir. 1968).

Grove v. Dun & Bradstreet, *supra*, again has applicability on the damage phase of the present controversy. There, as here, the jury found no so-called special damage, and the trial court attached considerable significance to that fact in granting D & B's motion for new trial. Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc. v. Grove, 286 F.Supp. 899 (1968). On appeal this action of the trial court was reversed with the observation that in a libel per se case a jury's award of general damage is not to be reversed because it may exceed the specific damages reflecting a decrease in

trade or loss of profit. In Kinsella v. Leonard, 415 F.2d 574 (10th Cir. 1969), we observed that federal trial courts are extremely reluctant, and rightly so we add, to set aside jury verdicts fixing the amount of damages. Using the same yardstick, we too are extremely reluctant to set aside a jury's verdict fixing the amount of damages in an action of this type and we decline to do so.

Judgment affirmed.