James C. DIXSON, Plaintiff, Appellee and Cross-Appellant,

v.

NEWSWEEK, INC., Defendant, Appellant and Cross-Appellee.

Nos. 76–1350 and 76–1351.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 20, 1977.

Decided Sept. 22, 1977.

Richard H. Plock, Jr., Denver, Colo. (Clanahan, Tanner, Downing & Knowlton, Denver, Colo., on the briefs), for plaintiff, appellee and cross-appellant Dixson.

Leo P. Larkin, Jr., New York City, and James A. Clark, Denver, Colo. (Stephen Froling of Rogers & Wells, New York City, and Clark, Martin & Pringle, Denver, Colo., on the brief), for defendant, appellant and cross-appellee Newsweek, Inc.

Before SETH, BREITENSTEIN and McWILLIAMS, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This libel action was begun in state court and removed to federal court on diversity grounds. A jury awarded plaintiff $75,000 in damages. The court reduced the amount to $45,000. No. 76–1350 is an appeal by the defendant from the damage award. No. 76–1351 is an appeal by the plaintiff from the reduction of the award. We affirm.

Plaintiff Dixson was a vice-president of Frontier Airlines, a regional air carrier based in Denver, Colorado. Before 1971, Frontier had suffered severe financial losses for several years. New management took control in 1971 and instituted drastic changes. A number of executives, including plaintiff Dixson, were discharged. The subsequent financial recovery of Frontier attracted national interest.

Defendant Newsweek publishes a weekly magazine with nation-wide circulation. The May 15, 1972 issue of Newsweek contained an article written by its reporter, John Dotson, on the rehabilitation of Frontier's finances. The three paragraphs of that article which form the basis of Dixson's complaint read:

"Feldman's other major problem was scheduling, to meld planes with passengers more profitably within the constraints of the CAB charter, and Gordon Linkon got that job. Formerly vice president of administration, he now found himself in direct conflict with James C. Dixson, Frontier's scheduling vice president. 'What the scheduler was doing was to keep the planes on a schedule that suited the maintenance and crew schedules,' Vollbrecht recalls. 'So we said, "We don't give a damn what your problems are; you've got to get planes where people want them. That's the business we're in." '

Dixson was fired last summer, and Linkon went on to make hundreds of schedule changes. In some cases, he discovered, the old schedules were outright fiction, with phony times listed to gain better position in airline guides. 'We felt that was lying,' says Feldman. 'And if the boss says it's okay to lie to the customers, it's okay to lie to the boss.' It's largely due to Linkon's scheduling that Frontier's load factor has risen by 15 per cent this year.

\* \* \* \* \* \*

Vollbrecht says he loses sleep over firing people, and the new management has worked to help its former executives find new jobs. 'Our treatment was not to imply that these people were bums,' he says. 'It was just that they were in jobs they couldn't handle.' "

Vollbrecht was Frontier's chairman of the board, and Feldman was its president. The Newsweek circulation of the issue containing the article was over two and one-half million copies.

The original complaint named Frontier, Vollbrecht, and Feldman as defendants along with Newsweek. Frontier and its two officers settled with Dixson and paid him $30,000 in return for a covenant not to sue. The case proceeded against Newsweek as the sole defendant.

Plaintiff Dixson was neither a public official nor a public figure. The subject of the Newsweek article was of some public interest. The extent of the protection which the First and Fourteenth Amendments give the press for libelous publications has been considered by the United States Supreme Court on a number of recent occasions. In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the Court said that damages could not be recovered for defamation of a public official without clear and convincing evidence of actual malice on the part of the publisher. Actual malice requires a showing of knowledge of falsity of the defamatory statement or reckless disregard of its truth or falsity. Ibid. at 279–280, 84 S.Ct. 710.

In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 163, 170, 172, 87 S.Ct. 1975, 18 L.Ed.2d 1094, the Court applied the strict New York Times standard to defamation of public figures. In *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262, the Court said that a showing of reckless disregard, as required by New York Times, must be based on evidence that the defendant "entertained serious doubts as to the truth of his publication." The plurality opinion in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 43, 55–57, 91 S.Ct. 1811, 1826, 29 L.Ed.2d 296, applied the New York Times standard to publications concerning private individuals in matters of public concern. Emphasizing the state interest in compensating private individuals for reputation damage, the Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 343, 94 S.Ct. 2997, 41 L.Ed.2d 789, modified *Rosenbloom* and said, Ibid. at 347, 94 S.Ct. at 3010:

"[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

In *Time, Inc. v. Firestone,* 424 U.S. 448, 454, 96 S.Ct. 958, 47 L.Ed.2d 154, the Court characterized the *Gertz* decision as a repudiation of the *Rosenbloom* holding that the New York Times standards apply to defamation of private persons whenever the statements concern matters of general public interest. The Court also said, Ibid. at 456, 96 S.Ct. at 966, that in *Gertz* the Court "sought a more appropriate accommodation between the public's interest in an uninhibited press and its equally compelling need for judicial redress of libelous utterances." The Court further said in *Time, Inc.,* Ibid. at 459, 96 S.Ct. at 968, that the constitutional limitations announced in *Gertz* are "a prohibition against imposing liability without fault," and "the requirement that compensatory awards 'be supported by competent evidence concerning the injury.'"

Within the stated limitations, a state is free to act. Colorado law controls in this case. In *Walker v. Colorado Springs Sun,* Inc., Colo., 538 P.2d 450, cert. denied 423 U.S. 1025, 76 S.Ct. 469, 46 L.Ed.2d 399, the Colorado Supreme Court affirmed a judgment against a newspaper publisher for defamation of a private person in an article of some public interest. The Colorado court adopted the *New York Times* standards as reviewed in *Rosenbloom* but rejected the St. Amant holding that reckless disregard must be based on evidence that the publisher entertained serious doubts of the truth of his publication. In so doing, it said that the term reckless disregard "has had rather frequent usage in the tort field in this state." Colorado has defined reckless disregard as "an act destitute of heed or concern for consequences, especially foolishly heedless of danger; headlong, rash; without thought or care of consequences." *Fanstiel v. Wright,* 122 Colo. 451, 222 P.2d 1001, 1003; see also *Coffman v. Godsoe,* 142 Colo. 575, 351 P.2d 808, 814–815.

The pertinent instruction of the trial court said:

" * * * the plaintiff must establish as I have told you by clear and convincing evidence that the defendant knew the statements to be false or made the statements with reckless disregard for whether they were true or not.

Reckless disregard implies a higher degree of culpability than negligence. Recklessly means wantonly, with indifference to the consequences."

The last quoted paragraph was taken from footnote 2 of the *Walker* opinion, 538 P.2d at 457. That note begins by citing *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419. Newsweek says that the reference to *Cantrell* is inapt because *Cantrell* was a suit for invasion of privacy, not libel. As we read the footnote, the reference to *Cantrell* was made to support the conclusion that a less demanding standard than that required by St. Amant was constitutionally permissible. For this purpose *Cantrell* was significant. The statement relating to "indifference to the consequences" conforms to Colorado tort law. That term is used in the definition of "reckless" and can only refer to the

previous portion of the instruction relating to reckless disregard for whether the statements were true or false.

■ The Colorado law stated in *Walker* does not impose liability without fault and does not violate the requirement that the damage award be supported by competent evidence. Colorado has no constitutional duty to confine recovery to situations where a defendant had serious doubt of the truth of his publication. Indeed, some states have adopted a mere negligence standard. See *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 560 P.2d 1216, 1221–1222, and cases there cited. The court's instructions accord with the Colorado law as declared in *Walker*.

The Newsweek article, entitled "Turnaround at Frontier: The Cost of Victory," dealt both with the financial aspects of Frontier's situation and with the necessity for, and effect of, managerial changes. The Newsweek article described plaintiff as Frontier's vice-president in charge of "scheduling." It stated that the schedules favored the maintenance and operation crews and that the schedules were "outright fiction, with phony times listed to gain better position in the airline guides." It quoted Feldman, the new president of Frontier as saying: "We felt that was lying." Vollbrecht, the Frontier chairman of the board, was quoted as saying with regard to the discharged executives, "they were in jobs they couldn't handle."

The parties stipulated that during the pertinent period, proposed schedules "were reviewed and passed upon by a group of senior officers including the President" and that "the technical final authority to accept or reject the schedule has reposed in the President."

Plaintiff did not and could not publish schedules or keep planes on schedule. All major departments were consulted in the scheduling process. Dixson testified that he did not favor the maintenance and operation department. Our attention is called to no contrary evidence.

The Civil Aeronautics Board considers performance acceptable if a flight arrives within 15 minutes of its scheduled arrival time on 75% of the total flights. Feldman, the new Frontier president, desired to increase the on-time performance to ·85%.· The Frontier annual report for 1971 contains the statement that "Frontier's record for on-time departures rose from 78% in 1970 to 85% without compromise to the number of flights completed as scheduled." Although the statement is somewhat ambiguous, it belies the claim that the schedules before the management overturn were fictitious, phony or lying to the public.

Feldman became the new president in March, 1971. Plaintiff continued in his position until late in August and left Frontier in December. Dotson, the Newsweek writer, testified that he did not know that the on-time percentage was almost exactly the same for the eight-month period preceding plaintiff's termination and the eight months that followed. An exhibit in the record shows the stated performance.

The Newsweek article quoted Chairman Vollbrecht as saying that the discharged executives, a group that included plaintiff, "were in jobs they couldn't handle." Dixson testified as to his technical competence and was supported by other witnesses, including Linkon, his immediate supervisor. Dixson said that he was terminated for incompatibility with the philosophy of the new management and not for incompetence. Two Frontier officials testified that plaintiff was not responsive to the new management. Neither said that plaintiff was discharged for incompetence. Reporter Dotson when reminded of his talk with Chairman Vollbrecht about people being in jobs which they could not handle conceded that Vollbrecht told him, "Those folks were one hundred and eighty degrees off our philosophy." Dotson said that he did not press the matter further with Vollbrecht.

■ Newsweek says that it accurately reported the statements of Frontier executives. The record supports a jury finding to the contrary. Vollbrecht's statement to Dotson related to differences in management philosophy, not incompetence. Be

that as it may, the republication of false defamatory statements is as much a tort as the original publication. See Restatement, Second, Torts § 581, p. 231, and *Cepeda v. Cowles Magazines and Broadcasting, Inc.,* 9 Cir., 328 F.2d 869, 871. *Edwards v. National Audubon Society, Inc.,* 2 Cir., 556 F.2d 113, is not in point. The plaintiff there was a public figure. The protections afforded the press when it reports on public officials and public figures do not shield it from liability when it publishes defamatory statements concerning private individuals. See *Gertz v. Robert Welch,* 418 U.S. at 343, 94 S.Ct. 2997.

■ Plaintiff's evidence sufficed to support a jury finding that Dotson knew that the quotations were taken out of context and were misleading. The statements purported to be of facts, not of opinions. They were neither fair comment nor criticism of matters of public interest. Newsweek argues the defamatory words were permissible hyperbole. Dotson may have intended that "fictitious," "phony," and "lying," when used in reference to scheduling were exaggerations for effect. The difficulty is that the words amounted to false representations of fact. The same is true of the statement that plaintiff was fired because he could not handle the job. The evidence is that he was competent but disagreed with his superiors on management policies. A publisher may not escape liability for defamation when it takes words out of context and uses them to convey a false representation of fact. See *Letter Carriers v. Austin,* 418 U.S. 264, 286, 94 S.Ct. 2770, 41 L.Ed.2d 745, and *Greenbelt Cooperative Pub. Assn., Inc. v. Bresler,* 398 U.S. 6, 13, 90 S.Ct. 1537, 26 L.Ed.2d 6. It is of some significance that Dotson did not question plaintiff about the defamatory statements when he interviewed the plaintiff before publication of the article.

■ Newsweek argues that the trial court at each stage of the proceedings, and this court on appeal, must review the evidence de novo to determine the sufficiency of the evidence to support recovery. The standard of review on libel actions is the same as in other cases. See *Guam Federation of Teachers, Local 1581, A.F.T. v. Ysrael,* 9 Cir., 492 F.2d 438, 441, cert. denied 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111. In *Walker,* 538 P.2d at 459, the Colorado court said: "This is not a case, however, for us to become a thirteenth juror." We have repeatedly said that we will not retry the facts. See e. g. *Quad Const., Inc. v. Wm. A. Smith Contracting Co.,* 10 Cir., 534 F.2d 1391, 1395; *Reardon v. United States,* 10 Cir., 491 F.2d 822, 825; and *United States v. Downen,* 10 Cir., 496 F.2d 314, 319, cert. denied 419 U.S. 897, 95 S.Ct. 177, 42 L.Ed.2d 142. The rule applies here. We will not disturb the jury verdict.

■ Newsweek argues that if any one of the statements on which plaintiff relies to establish defamation is not actionable for any reason, the verdict must be set aside because there is no way to know on what statement the jury predicated liability. The statement in *New York Times,* 376 U.S. at 284, 84 S.Ct. 710, with regard to a general verdict is not applicable. The reference there was to the trial court's failure to instruct the jury on the difference between general and punitive damages. We have rejected Newsweek's claims of privilege and fair comment. By failing to request special verdicts, Newsweek waived its right to complain on appeal. *Great Coast Exp., Inc. v. International Brotherhood of Teamsters,* 4 Cir., 511 F.2d 839, 845, and *Toth v. Corning Glass Works,* 6 Cir., 411 F.2d 912, 914, n.2.

■ The trial court instructed the jury on future damages and stated to the jury plaintiff's life expectancy as shown by mortality tables. Newsweek argues that future damages are not actual damages for which recovery may be had in a libel case. Although the Court in *Gertz* specifically declined to define actual damages, it said, 418 U.S. at 350, 94 S.Ct. at 3012, that "actual injury is not limited to out-of-pocket loss" and that actual harm includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." Reputation injury and personal humiliation may endure

beyond the end of a law suit. Plaintiff's evidence covered the continuous adverse effect of the article on his employment opportunities. Recovery for such injury is within the concept of actual damage. In tort actions, Colorado permits the award of damages for loss of future personal earnings. See e. g. *Thompson v. Tartler,* 166 Colo. 247, 443 P.2d 365, 369. The reference to the mortality table to put an outer limit on future damages was within the court's discretion and did not prejudice Newsweek.

■ Newsweek argues that inadmissible hearsay testimony was received on lost business opportunities. We need not decide whether the testimony was hearsay or whether it was within an exception to the hearsay rule. The testimony was cumulative and corroborative to other evidence on the same point. The receipt of the testimony did not affect a substantial right of Newsweek or result in a denial of substantial justice. See Rule 61, F.R.Civ.P.

■ Newsweek argues that the damages were excessive and contrary to the weight of the evidence. We are reluctant to set aside jury verdicts setting damages in libel actions. See *Kansas Electric Supply Co., Inc. v. Dunn and Bradstreet, Inc.,* 10 Cir., 448 F.2d 647, 652, cert. denied 405 U.S. 1026, 92 S.Ct. 1289, 31 L.Ed.2d 486. The award here was within the range of the testimony received. *Buena Vista Homes, Inc. v. United States,* 10 Cir., 281 F.2d 476, 480. We will not retry the facts. Ibid. and *Wilson v. United States,* 10 Cir., 350 F.2d 901, 905.

The court granted Newsweek's post-trial motion to reduce the $75,000 award by the $30,000 which plaintiff received in settlement with the Frontier defendants. Before trial, plaintiff and the Frontier defendants filed a stipulation for the dismissal with prejudice of the action against the Frontier defendants, and the court dismissed them from the action.

Attached to the stipulation was a covenant not to sue which recited the payment to plaintiff of $30,000. Plaintiff covenanted not to sue the Frontier defendants on any claim arising out of the article published in the May 15, 1972, issue of Newsweek. The covenant expressly stated that it did not release Newsweek and that plaintiff reserved the right to proceed against Newsweek. In his appeal, No. 76–1351, plaintiff asserts that the award should not have been reduced by the amount of the settlement.

The first claim for relief stated in the complaint was against Newsweek and the second against the Frontier defendants. Each claim was based on the article appearing in the May 15, 1972, issue of Newsweek. The allegations charging defamation of Newsweek and the Frontier defendants are substantially the same. The record contains no evidence of any injury caused by the original publication of the defamation by the Frontier defendants.

■ In Colorado, each publication of a defamatory statement is a separate tort. *Spears Free Clinic & Hospital for Poor Children v. Maier,* 128 Colo. 263, 261 P.2d 489, 491. That rule has no application here. Plaintiff relies on but one publication, that in the Newsweek article. His evidence established but one injury. The covenant not to sue expressly reserves his right to proceed against Newsweek. Colorado has held that when there is a single injury and a contractual reservation of a right to sue another, a settlement with one joint tort-feasor does not foreclose an action against another joint tort-feasor but any award against the non-settling tort-feasor must be reduced by the amount paid by the settling tort-feasor. *Cox v. Pearl Investment Co.,* 168 Colo. 67, 450 P.2d 60, 63. We followed *Cox* in *Gardner v. General Motors Corporation,* 10 Cir., 507 F.2d 525, 529, a case arising in Colorado, and reduced an award by the amount received from a settling joint tort-feasor.

Plaintiff argues that he could have attempted to recover presumed and punitive damages from the Frontier defendants and, hence, there is no double recovery. He requested, and the court refused, an instruction on the recovery of punitive damages from Newsweek. Double recovery may not be permitted on the basis of what plaintiff might have done.

Plaintiff argues that because of the general verdict it cannot be ascertained on which of his claims for actual damage the jury allowed compensation. Plaintiff did not request a special verdict and is in no position to complain.

The authorities are split on the question of whether a set-off is an issue for the jury or for the court. Recognizing the split and the absence of a Colorado decision in point, the trial court concluded that Colorado would adopt the rule that the set-off issue is for the court. In the circumstances, the trial court's determination is entitled to great weight, *United States v. Wyoming National Bank of Casper,* 10 Cir., 505 F.2d 1064, 1068, and will not be disturbed unless clearly erroneous, *Chavez v. Kennecott Copper Corp.,* 10 Cir., 547 F.2d 541, 543. Decision by the court alleviates the concern that the jury might either consider the settlement as evidence that the in-court defendant is liable or that the responsible party is not in court. We agree with the trial court.

Plaintiff argues further that the settlement is a type of payment which should be asserted under Rule 8(c), F.R. Civ.P., as an avoidance or affirmative defense. He says that Newsweek's failure to plead the defense amounts to a waiver. Relevant to determination of what is an affirmative defense is consideration of whether plaintiff was taken by surprise. See 5 Wright & Miller, Federal Practice and Procedure, § 1271 at 315. The plaintiff filed the stipulation for dismissal against the Frontier defendants and attached the covenant not to sue. Neither party put any reservations or restrictions on the use or significance of the covenant. The result was an implied amendment to the pleadings under Rule 15(b) to conform to the proof. *Gibbs v. Randolph,* 5 Cir., 250 F.2d 41, 43. Newsweek properly raised the issue in its post-trial motion.

In both No. 76–1350 and No. 76–1351, the judgment is affirmed.