## No. 26327

**Wesley W. Walker and Katherine L. Walker v. The Colorado Springs Sun, Inc., William J. Woestendiek, Doyle Trent and Spencer A. Simco**

(538 P.2d 450)

Decided March 17, 1975. Opinion modified and as modified rehearing denied June 2, 1975.

Spurgeon, Aman & Hanes, Gregory R. Piche, for plaintiffs-appellees.

Holme Roberts & Owen, John L. Kane, Jr., Phillip C. Gans, for defendants-appellants The Colorado Springs Sun, Inc., William J. Woestendiek and Doyle Trent.

Yegge, Hall & Evans, Richard D. Hall, Thomas B. Kelley, for amicus curiae, The Colorado Press Association.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This is an appeal from a judgment entered on a verdict awarding $29,200 compensatory damages and $9,900 in exemplary damages in a libel action against the Colorado Springs Sun; its editor and publisher, William J. Woestendiek; one of its reporters, Doyle Trent; and one Simco. Simco is not here on this appeal and by using the word ''defendants'' we refer only to the

Sun, its publisher and its reporter. We affirm as to the Sun and its editor and publisher, Woestendiek, but reverse as to the reporter, Trent.

Unless we indicate otherwise, our recitation of the facts is based upon undisputed testimony.

In late 1971, the vacant home of Mrs. Alter, an elderly widow who was living in a nursing home, was burglarized. In value, only one-third of Mrs. Alter's property was taken by the thieves. Items that were taken were sold to the plaintiffs Mr. and Mrs. Walker, who operated an antique shop under the name of ''Cobweb Antiques'' (called Cobweb) in Colorado Springs. The plaintiffs bought the goods in good faith, having no knowledge of the theft or of the fact that the items were stolen goods. They paid $112.50 for the property.

Simco, a friend of Mrs. Alter, identified some of the stolen items displayed for sale at Cobweb as belonging to Mrs. Alter. Simco returned to the shop with two police officers. Mr. Walker provided the police with cancelled checks identifying the persons from whom he had purchased the goods, and removed the items from the shelves. The property was crated and a hold order placed on it by the police. Simco was told by an assistant district attorney that recovery of the goods was a civil matter between the owner of the goods and the Walkers. Simco offered $60 to the Walkers if they would release the goods to him. The offer was refused. Simco told the Walkers that they could sell the goods for $2,000, to which neither of them responded.

Simco then visited the Colorado Springs Sun (referred to as the Sun) where he told the story to the reporter, Trent. Simco told Trent, among other things, the following: that the police suggested that Simco find the goods himself; that Simco searched through all the Colorado Springs antique shops before discovering the stolen goods at Cobweb; that the thieves helped themselves to everything of value from Mrs. Alter's home; that Mrs. Alter said, ''I will not pay for things that are already mine''; that neither he nor Mrs. Alter could afford a lawyer; that the Cobweb had purchased the goods for $112.50; that he offered to buy the goods back; that Walker said he stood a chance to make a good profit if he could sell the items; and that Simco had hired a lawyer but wasn't sure that he was going to ask the lawyer to pursue the

matter. Simco also told Trent either (a) that the stolen goods were worth $2,000; (b) that the value of the goods was $2,000; or (c) that the Walkers had them up for sale for $2,000. Simco told Trent that he had looked at some of the price tags. Nothing in the record supports a contemplated sale price approaching $2,000.

Several articles concerning the matter were published by the Sun. It also published some letters received from readers. These articles and letters are the bases for the libel action.

After Simco related the story to Trent, the reporter contacted Assistant District Attorney Elvin Gentry, who informed him that he was familiar with the case and that Simco had approached him and asked help in effecting the return of Mrs. Alter's goods. Gentry told Trent that he had informed Simco that, since there were no criminal charges against the Walkers, the district attorney's office could offer no help as the ownership of the goods was a civil matter; that the district attorney's office handled only criminal matters; and that it could not give advice in civil matters. A detective of the Colorado Springs Police Department confirmed that a burglary had occurred at Mrs. Alter's home and that some of the property had been identified at the Cobweb.

Trent next contacted Mrs. Walker. Mrs. Walker testified that Trent identified himself as a reporter for the Sun, told her he was calling in regard to some things taken from Mrs. Alter and asked if she knew what he was talking about. When she said "yes," he asked her if she still had the items and she again said "yes," and told him that he would have to talk with their attorney. Trent's version of the conversation varied. He testified that he told her of Simco's story and asked her if it were true; that she neither confirmed nor denied the truth of the statements, but responded by telling him to talk to their lawyer; and that he did not ask for, nor did Mrs. Walker tell him, the name of their attorney.

Trent subsequently wrote the first article which was published by the Sun on February 28, 1972 which quoted Mrs. Alter as saying "I will not pay for things that are already mine." The article said further that the Walkers refused to return the property "even though everyone — including the police — know it is hers," that the goods represented "everything of value" in her

home and that "Simco said the shop owners told him they paid $112.50 for the items, and have priced it [sic] for resale at about $2,000."

On March 2, 1972, the Sun published an article, whose authorship is not of record, which related and compared laws of several different states relating to stolen property in the hands of a third party. It spoke of "someone like Mrs. Anna Alter, currently facing such a problem." It neither mentioned the Walkers nor named their shop.

After a settlement was negotiated by attorneys representing Simco and the Walkers, Trent published an article entitled "Dealer 'Sells Back' Burglarized Goods" and stating that Mrs. Alter would recover some of the property — "but only after a second hand dealer makes a profit." It related again the difficulties encountered by Simco in trying to recover stolen property. Before this article was published, Trent contacted Mr. Walker, who told him that the $2,000 figure used in the previous article written by Trent was incorrect. Walker stated to Trent that he had purchased the goods for $112.50 and that a final settlement had been reached for $150. Walker did not tell Trent of any other possible errors, nor did he tell him that he (as Walker later testified) had increased the value of the goods to the extent of $112 by repairing and refinishing them.

In addition to the three articles mentioned, the Sun published an editorial written by defendant Woestendiek in a regularly appearing column called "Thinking Out Loud" wherein he expressed "outrage" at "what seemed to be unjust treatment given 93 year old Mrs. Anna Alter." The article repeated the story of the burglary and that the Cobweb put the goods up for sale for $2,000. Woestendiek had received all his information from his reporters and staff, making little or no independent investigation.

Woestendiek also selected a number of letters concerning the subject and published them under a heading called "Sound Off" in which letters to the editor are printed. Woestendiek testified that he considered the opinions expressed by the writers of the letters to be of public interest; and that the focus-issue underlying all the publications, including the letters involved, was the return of stolen goods to the rightful owner.

Among the letters which were published was one printed under the heading, "Black eye for all dealers," in which the author stated that he had read of Cobweb's "preferring to resell the merchandise rather than return it to their rightful owner." Another writer expressed anger at "law used to protect the guilty and not the innocent." "A Concerned Citizen" expressed an unwillingness to do business with " a shop owner who knowingly sells stolen goods." Another letter stated that although Mr. Walker

"undoubtedly bought these goods 'in good faith;' that is not the point. If any one can buy stolen goods and resell them, knowing they are stolen — as Mr. Walker did — then any 'fence' can do the same . . . ."

The headline above another letter read "State 'fence' paradise."

A thorough exegetic treatment of this case would involve a lengthy discussion of the law as it existed, both generally and particularly in Colorado, prior to the announcement of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 in 1964. Such an opinion would include a discussion of the extent to which we may be changing the rule of prior decisions of this court and extended reasons therefor, even though the determination here made has not been required to date by First Amendment decisions of the United States Supreme Court. We do not do so because here our principal effort is to adopt the rule of the plurality in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed. 296 (1971), and rule on sufficiency of the evidence in this case under that rule. Perhaps, at a later time, when we are deciding more of the current legal questions in libel we may undertake to set forth an historical background.

■ *New York Times Co., supra,* held that the First and Fourteenth Amendments forbade a public official from recovering damages for a defamatory falsehood relating to his official conduct unless it was proved that the statement was made with *"actual malice."* "Actual malice," as distinct from the usual legal concept of malice, was defined as arising from the publication of a statement with knowledge that it was false or with reckless disregard for whether it was true or not. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967),

applied the same rule to ''public figures.''[1] In *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality, but not a majority, of the Supreme Court applied the *New York Times Co.* and *Butts* rule to a defamatory statement made about a private individual when an ''event of public or general concern'' is involved. In dissenting in *Rosenbloom,* Mr. Justice Harlan would have applied a standard of simple negligence.

This case was at issue here and on April 15, 1974 we heard oral arguments. Before we had announced any opinion, the United States Supreme Court on June 24, 1974 decided *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, reversing a district court judgment and a circuit court affirmation thereof, and ordering a new trial in the light of the views expressed by the majority.

Gertz had brought a libel action in the United States District Court. Prior to and during the trial the judge did not apply the *New York Times* rule. The jury awarded $50,000 to Gertz. Thereafter, just six months prior to the announcement of *Rosenbloom,* the trial court entered judgment for the defendant n.o.v. *Gertz v. Robert Welch, Inc.,* 322 F.Supp. 997 (N.D. Ill. 1970).

We quote the facts from Gertz from Mr. Justice Powell's majority opinion:

''In 1968 a Chicago policeman named Nuccio shot and killed a youth named Nelson. The state authorities prosecuted Nuccio for the homicide and ultimately obtained a conviction for murder in the second degree. The Nelson family retained petitioner Elmer Gertz, a reputable attorney, to represent them in civil litigation against Nuccio.

''Respondent publishes American Opinion, a monthly outlet for the views of the John Birch Society. Early in the 1960's the magazine began to warn of a nationwide conspiracy to discredit local law enforcement agencies and create in their stead a national police force capable of supporting a communist dictatorship. As

---

[1]Mr. Justice Harlan, writing for the majority, indicated that ''public figures'' are those who ''commanded a substantial amount of independent public interest at the time of the publications.'' 388 U.S. at 154.

part of the continuing effort to alert the public to this assumed danger, the managing editor of American Opinion commissioned an article on the murder trial of officer Nuccio. For this purpose he engaged a regular contributor to the magazine. In March of 1969 respondent published the resulting article under the title 'FRAME-UP: Richard Nuccio And The War On Police.' The article purports to demonstrate that the testimony against Nuccio at his criminal trial was false and that his prosecution was part of the communist campaign against the police.

"In his capacity as counsel for the Nelson family in the civil litigation, petitioner attended the coroner's inquest into the boy's death and initiated actions for damages, but he neither discussed officer Nuccio with the press nor played any part in the criminal proceeding. Notwithstanding petitioner's remote connection with the prosecution of Nuccio, respondent's magazine portrayed him as an architect of the 'frame-up.' According to the article, the police file on petitioner took 'a big, Irish cop to lift.' The article stated that petitioner had been an official of the 'Marxist League for Industrial Democracy, originally known as the Intercollegiate Socialist Society, which has advocated the violent seizure of our government.' It labelled Gertz a 'Leninist' and 'Communist-fronter.' It also stated that Gertz had been an officer of the National Lawyers Guild, described as a communist organization that 'probably did more than any other outfit to plan the Communist attack on the Chicago police during the 1968 Democratic convention.'

"These statements contained serious inaccuracies. The implication that petitioner had a criminal record was false. Petitioner had been a member and officer of the National Lawyers Guild some 15 years earlier, but there was no evidence that he or that organization had taken any part in planning the 1968 demonstrations in Chicago. There was also no basis for the charge that petitioner was a 'Leninist' or a 'Communist-fronter.' And he had never been a member of the 'Marxist League for Industrial Democracy' or the 'Intercollegiate Socialist Society.'

"The managing editor of American Opinion made no effort to verify or substantiate the charges against petitioner. Instead, he appended an editorial introduction stating that the author had 'concluded extensive research into the Richard Nuccio case.'

And he included in the article a photograph of petitioner and wrote the caption that appeared under it: 'Elmer Gertz of the Red Guild harrasses Nuccio.' Respondent placed the issue of American Opinion containing the article on sale at newsstands throughout the country and distributed reprints of the article on the streets of Chicago.''

Further quoting from *Gertz:*

''Following the jury verdict and on further reflection, the District Court concluded that the *New York Times* standards should govern this case even though petitioner was not a public official or public figure. It accepted respondent's contention that that privilege protected discussion of any public issue without regard to the status of a person defamed therein. Accordingly, the court entered judgment for respondent notwithstanding the jury's verdict.''

As mentioned, the Court of Appeals affirmed. *Gertz v. Robert Welch, Inc.,* 471 F.2d 801 (7th Cir. 1972).

In reversing the circuit court the United States Supreme Court said:

''We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.''

On July 17, 1974, no opinion having issued here, we ordered that counsel file simultaneous briefs within sixty days on the following points:

''1. In the light of the U.S. Supreme Court decision in *Gertz v. Robert Welch, Inc.,* decided June 25, 1974, 42 Law Week 5123, what is the appropriate standard of liability that Colorado should adopt for a publisher or broadcaster of defamatory falsehoods injurious to a private individual?

''2. Should there be a different standard of liability upon publications of matters of general or public concern than if the matter has no public interest or public concern, and if so, what should be the standards for each?

''3. If this Court should decide not to require the actual malice test for liability, but should instead lay down a less stringent rule for liability, should this rule be retroactively applied, if so, in what manner?

"4. In the light of the above questions, if this court should determine the actual malice was lacking in this case as a matter of law, what should be the disposition of this case?"
Thereafter, briefs were filed by the parties, as well as by the Colorado Press Association as *amicus curiae*. We heard further oral arguments in the light of *Gertz* on November 19, 1974.

We are asked to — and we herein — pronounce the standard of liability for a publisher or broadcaster of defamatory falsehood which is injurious to a private individual and which relates to an event of public general concern. On the one hand, the defendants ask that we apply the plurality standard of *Rosenbloom*. In contrast, the plaintiffs request us to rule that the Colorado standard in such cases will be that of simple negligence, *i.e.,* to follow the dissent of Mr. Justice Harlan in *Rosenbloom*. With a limitation made later herein, we adopt the standard of the plurality in *Rosenbloom;* rule that the court correctly instructed the jury as to the standard of liability; and hold that the evidence was sufficient to support the verdicts.

It might be said that, under the result reached here, we need not adopt one or the other of the suggested standards. We feel, however, that the bench, the bar and the public are entitled *now* to an announcement of the rule in Colorado on this point.

The gate has been opened by *Gertz*. We find *Gertz* slightly enigmatic in that it permits us to rule — as we do here rule — contrary to some of the opinions expressed therein. *Gertz* does not follow, and appears to disapprove of, the rule stated above in *Rosenbloom*. This thought is predicated in part upon the following language in *Gertz:*
"For these reasons we conclude that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual. The extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable. And it would occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not — to determine, in the words of MR. JUSTICE MARSHALL, 'what information is relevant to self-government.' *Rosenbloom v. Metromedia, Inc.,* 403 U.S., at

79. We doubt the wisdom of committing this task to the conscience of judges. Nor does the Constitution require us to draw so thin a line between the drastic alternatives of the *New York Times* privilege and the common law of strict liability for defamatory error. The 'public or general interest' test for determining the applicability of the *New York Times* standard to private defamation actions inadequately serves both of the competing values at stake. On the one hand, a private individual whose reputation is injured by defamatory falsehood that does concern an issue of public or general interest has no recourse unless he can meet the rigorous requirements of *New York Times*. This is true despite the factors that distinguish the state interest in compensating private individuals from the analogous interest involved in the context of public persons. On the other hand, a publisher or broadcaster of a defamatory error which a court deems unrelated to an issue of public or general interest may be held liable in damages even if it took every reasonable precaution to ensure the accuracy of its assertions.''

In *Gertz* the majority appears to favor a simple negligence standard in cases not involving a public official or public figure. At least, it indicates that such a standard is permissible in discussing exemplary damages: ''. . . punitive damages are wholly irrelevant to the state interest that justifies a negligent standard for private defamation actions.''

■ In the instant case, the plaintiffs admittedly were neither public officials nor public figures. The trial court found that the subject involved was a matter of public interest and concern. We agree. It followed *Rosenbloom,* except that in its instruction the term ''actual malice'' was not used. Instruction No. 2, after advising the jury that some of the publications were libelous per se, read:

''You are instructed, however, that under the law a newspaper and its staff . . . are privileged to publish even defamatory material concerning an individual, provided such privilege is not abused. The privilege is abused only if the Plaintiffs establish that the publications were false in some material manner and such statements were published with knowledge that they were false or with reckless disregard of whether they were false or not.''

## I.

As already stated, we are asked by the plaintiffs to adopt a rule of simple negligence as the standard of liability under which the publisher of a defamatory statement against a private individual may be held liable, if the matter involves an event of public or general concern. In such matters the defendants request that we adopt the rule of *Rosenbloom.*

Insofar as we are advised, this is the first opinion by a state court of last resort under *Gertz.* Speaking for the majority of the Court of Appeals of Indiana, Third District, Judge Staton wrote *AAFCO Heating and Air Conditioning Company v. Northwest Publications, Inc.,* Ind. Ct. App. , 321 N.E.2d 580 (announced December 30, 1974). The majority there (2 to 1) came to substantially the same result as the majority of this court, although in making its determination it relied in some part upon a state consitutional provision. Parenthetically, for the uninitiated who seek expositions upon the backgrounds and issues of the subject, we suggest they start with the excellent discussions in *Gertz* and *AAFCO.*

The "reckless disregard" portion of "actual malice" under the *New York Times* test was the subject of further explanation or definition in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). As we read *St. Amant,* it says virtually that in order for there to be a finding of reckless disregard of the truth, there "must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." The plurality in *Rosenbloom* followed this statement from *St. Amant.*

In adopting the rule of *Rosenbloom,* we do so with the limitation that "reckless disregard" for whether or not a statement is true does not mean that there must be a finding that the person making the statement had serious doubts as to the truth thereof. In short, we adopt *Rosenbloom,* but without the stated explanation or definition made by *St. Amant* as to "reckless disregard."

We hold that, when a defamatory statement has been published concerning one who is not a public official or a public figure, but the matter involved is of public or general concern, the publisher of the statement will be liable to the person defamed if,

and only if, he knew the statement to be false or made the statement with reckless disregard for whether it was true or not.

The *St. Amant* statement of "serious doubts" as a test of "reckless disregard" has merit in that it gives a more concrete guideline to a jury with respect to "reckless disregard." However, the consensus of the majority of our court is that we should not approve the *St. Amant* definition at this time, since the term "reckless disregard" has had rather frequent usage in the tort field in this state.[2]

█ The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." Under the Fourteenth Amendment, this applies to the states. *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). We recognize that there is no perfect rule to be promulgated which will balance the conflict between the First Amendment right of the press and the injury sustained by a person defamed, more particularly when that person is a *private individual* involved in a subject of public or general concern. Our ruling here results simply from our conclusion that a simple negligence rule would cast such a chilling effect upon the news media that it would print insufficient facts in order to protect itself against libel actions; and that this insufficiency would be more harmful to the public interest than the possibility of lack of adequate compensation to a defamation-injured private individual. We quote from Judge Staton in *AAFCO:*

"The United States Supreme Court recognized in *New York Times Co. v. Sullivan, supra,* that a rule requiring the media to guarantee the truth of its news reporting would lead to self-censorship. Publishers, fearful of being unable to prove the truth of their statements, would avoid the publication of controversial articles. We refuse to adopt a rule that would allow private citizens to obtain damage judgments on the basis of a jury determina-

---

[2]*Cantrell v. Forest City Publishing Co.,* 418 U.S. 909, 95 S.Ct. 465, 41 L.Ed.2d 1156 was announced on December 18, 1974, about six months following the announcement of *Gertz.* This affirmed the trial court wherein the judgment had been granted to private individuals for libel. It quotes the trial judge's instruction as follows: "Recklessness implies a higher degree of culpability than negligence. Recklessly means wantonly, with indifference to consequences." It appears from this that the *St. Amant* definition was not used.

tion that a publisher probably failed to use reasonable care. Such a rule would promote self-censorship by causing publishers to 'steer far wider of the unlawful zone.' *Speiser v. Randall* (1958), 357 U.S. 513, 536. The uncertainty attendant upon a reasonable care standard would charge the press with 'the untolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait.' *Time, Inc. v. Hill, supra,* 385 U.S. at 389. A publisher's fear of guessing wrong about juror assessment of the reasonableness of the news gathering procedures he employs would inevitably deter 'protected' speech. Furthermore, the standard of proof employed in libel actions heightens the risk of self-censorship inherent in a 'reasonable care' standard of media privilege.''

In *Rosenbloom* it was observed that ''the vagueness of the negligence standard itself would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate.'' From *St. Amant:* ''[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protects some erroneous publications as well as true ones.'' From *Gertz:* ''The First Amendment requires that we protect some falsehood in order to protect speech that matters.''

## II.

■ We hold that the evidence was insufficient to support a finding of reckless disregard or knowledge of falsity on the part of Trent. Before writing his story Trent investigated what Simco had told him. He contacted the Assistant District Attorney and a detective for the Colorado Springs Police Department who both verified the substance of Simco's story. Further, Trent called Mrs. Walker who did not tell him anything to cause him to disbelieve the story. Only after this investigation did he report what he had good reason to believe was the truth of the matter. Additionally, only one statement was unsupported by the evidence — that the goods had been priced for $2,000.

Under these circumstances, we cannot find evidence to support the jury's finding that Tent recklessly disregarded the truth.

## III.

■ We hold that the evidence sufficiently supports a finding of publication of statements by the defendants, Sun and Woestendiek, with *reckless disregard* as to whether they were true (as to

compensatory damages), and, with a wanton or *reckless disregard of the rights and feelings of the plaintiffs* (as to exemplary damages).

The following are some of the items of evidence from which the jury could conclude that the defendants, Sun and Woestendiek, did act recklessly in the sense involved both as to compensatory damages and punitive damages: entitling a published letter, "Black eye for all dealers," which letter stated that the Walkers preferred to resell the articles rather than return them to the rightful owners; publishing letters expressing anger at the law being used to protect the guilty and not the innocent; publishing an opinion that the writer was thoroughly amazed that the plaintiffs would even consider selling merchandise known to be stolen; headlining a letter "State 'fence' paradise": publishing an opinion that the writer would not do business with one who knowingly sells stolen property; and continuing to publish news articles and letters two weeks after the settlement had been made.

There was sufficient basis for the finding of reckless disregard on the part of Woestendiek and the Sun in the publication of the defamatory letters. Although a publisher can assume the truth of the facts contained in his reporters' stories, *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), this cannot apply to the publication of the letters. Woestendiek — and only Woestendiek — selected the letters to be published. This supports the jury's verdict as to Woestendiek and, of course, the Sun.

*New York Times* and *Rosenbloom* hold that First Amendment questions of constitutional fact compel an appellate court's de novo review, and that liability must be supported with convincing clarity. This is not a case, however, for us to become a thirteenth juror. We believe there was convincing clarity to the evidence presented by and on behalf of the plaintiff. *See Cantrell v. Forest City Publishing Co., supra,* as cited in footnote 2 hereof.

We have gone quite a great distance in this opinion to protect the public media under the First Amendment. Under the facts of this case, the right of free press does not compel or justify us in finding as a matter of law that the plaintiff did not prove their case against Woestendiek and the Sun as to both types of damages.

IV.

We anticipate the issue: Is the determination that a matter

is of public interest or concern a question of law for the court or a question of fact for the jury? We rule that it is a question of law for the court. In doing so, we are not unmindful of the difficulties engendered as above set forth by Mr. Justice Powell in *Gertz*. The cases which we have read either hold or assume that this is a question of law for the court. This was the assumption in *Gertz*. *Firestone v. Time, Inc.*, 271 So.2d 745 (Fla. 1972) specifically so held.

## V.

 The trial court, we think, wisely did not use the term "actual malice" in the instructions. As stated above, this was a term used to designate a constitutional standard in *New York Times*. This use of "actual malice" is entirely different from common-law "malice." Because of the possibility of confusion of meanings the trial judge eliminated "actual malice" from the instructions, mentioning Mr. Justice Brennan's footnote [9] in *Rosenbloom*. As indicated, we entirely agree with the trial judge and think that it would not be good practice to use the term "actual malice" in instructions in future cases.

## VI.

 The defendants have argued that a demand to the publisher for retraction of an allegedly false statement should be a condition precedent to the commencement of an action for libel. *Colorado Jury Instructions* 22:15 provides for consideration of retraction in mitigation of damages. We have concluded that whether a demand for retraction should become a condition precedent to the filing of an action is more properly within the legislative ambit than the subject of initial judicial purview. For an example of statutes making such provision, *see Kapellas v. Kofman*, 1 Cal.3d 20, 459 P.2d 912, 81 Cal. Rptr. 360 (1969); and *AAFCO, supra*. We, therefore, do not rule upon whether a demand for retraction should be a condition precedent.

## VII.

We have been asked to hold that it is no longer necessary to maintain the distinction between libel *per se* and libel *per quod*. This question, as with others that have been presented in this case, we reserve for decision in some other case at some later date.

Judgment affirmed in part and reversed in part, and cause remanded with directions to vacate the judgment against Trent and dismiss the complaint as to him.

MR. JUSTICE ERICKSON and MR. JUSTICE LEE specially concur in part and dissent in part.

MR. JUSTICE ERICKSON specially concurring in part and dissenting in part:

I would affirm the trial court on the issue of liability with respect to all defendants, but I would adopt a negligence standard and not the "reckless disregard" test. When this case was tried, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), had not been decided. In the *Gertz* case, the Supreme Court reevaluated the constitutional limitations on civil actions for defamation and held that although public figures and public officials must prove recklessness to recover in defamation suits against the news media, private individuals need only prove negligence. The only proscription which the Supreme Court imposed upon the states in the *Gertz* case was that recovery for false, defamatory statements could no longer be predicated on strict liability and punitive damages could not be awarded in the absence of a showing of knowledge of falsity or reckless disregard for the truth. The record more than supports the jury's verdict when viewed from the standpoint of negligence, and the award for punitive damages was predicated on evidence and instructions which meet the test of recklessness. Moreover, the instructions in this case are a credit to the trial judge and were fashioned with the limitations imposed by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny in mind. *Accord, Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

The majority opinion in this case relies upon *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), as authority for saddling the citizens of Colorado with a prohibition against recovery for false, defamatory publications, when the proof falls short of the "reckless disregard" standard announced in *New York Times Co. v. Sullivan, supra,* and *Curtis Publishing Co. v. Butts, supra. Rosenbloom* was a plurality opin-

ion written by Mr. Justice Brennan, and concurred in by the Chief Justice and Mr. Justice Blackmun, which had little vitality when it was announced and even less today. *Symposium – First Amendment and the Media*, 26 Hastings L. J. No. 3 (1975); Brosnahan, *From Times v. Sullivan to Gertz v. Welch: Ten Years of Balancing Libel Law and the First Amendment*, 26 Hastings L. J. 777 (1975); *The Supreme Court, 1973 Term*, 88 Harv. L. Rev. 41, 139-148 (1974). *See* Kalven, *The Reasonable Man and the First Amendment: Hill, Butts and Walker*, 1967 Supreme Court Review 267; Note, 40 Ford. L. Rev. 651 (1972). Both *Rosenbloom* and *Gertz* focused on the issue of whether the knowing or reckless falsity standard applies to a defamation action brought by a private citizen when the defamatory statements relate to "an event of public or general interest." Mr. Justice Harlan dissented in *Rosenbloom* and applied a negligence standard. His dissent was adopted in the majority opinion in the *Gertz* case written by Mr. Justice Powell and reflects the standard which Colorado should follow, in my opinion.

The quagmire of confusion that has been created by the intervention of the Supreme Court of the United States into the law of libel and slander on a constitutional plane is regrettable. In *Gertz*, Mr. Justice Powell acknowledged that "this court has struggled for nearly a decade to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." In a separate concurring opinion in *Gertz*, Mr. Justice Blackmun set forth the reasons for his change in position and decried the fact that the Supreme Court was so sadly fractionated in the *Rosenbloom* opinion. In recognizing the need of striking a balance between the competing values which are admittedly in issue, Mr. Justice Blackmun joined the majority of the court in *Gertz* to reach a definitive ruling and certainty in the law of defamation.[1]

---

[1]The majority opinion was written by Mr. Justice Powell, and was concurred in by Mr. Justices Stewart, Marshall, and Rehnquist. Mr. Justice Blackmun wrote a separate concurring opinion. Mr. Justice Douglas and Mr. Justice Brennan voted to affirm the court of appeals and deny recovery. Mr. Justice Douglas restated his view that the First and Fourteenth amendments make all state libel laws unconstitutional. Mr. Justice Brennan reiterated his view that all discus-

It is impossible to suggest that the facts in *Rosenbloom* are sufficiently different to cause the court, on a factual basis, to come to a different conclusion in *Gertz* than in *Rosenbloom*. False, defamatory statements by the news media involving a private citizen provided the foundation for the decision in both cases.

To put this court's dilemma in proper perspective, it is necessary to review the facts in the *Gertz* case. Elmer Gertz brought a civil damage action for the family of a youth who was slain by Nuccio, a Chicago policeman. Nuccio had been convicted of second-degree murder. Gertz had nothing to do with the criminal prosecution. However, *American Opinion,* a journal expressing the views of The John Birch Society, viewed Nuccio's conviction as part of a nationwide plot to discredit local police forces and published an article charging that the prosecution was a frame-up engineered and planned by Gertz. The article also, among other allegations, referred to Gertz as a "Leninist" and as a "Communist fronter."[2]

There was no truthful basis for the charges in the *Gertz* case. As a result, Gertz filed a libel action in the federal court on the

sions of public issues should be protected by the knowing or reckless falsehood statute. Mr. Chief Justice Burger and Mr. Justice White dissented and voted to reinstate the verdict in favor of Gertz, which was based on a strict liability standard. The Chief Justice emphasized the public policy of shielding lawyers from the publicity surrounding unpopular cases. Mr. Justice White pointed out the importance of keeping federalism on a proper level and decried the court's wholesale remaking of state tort law, electing to reinstate strict liability to protect private citizens from defamatory publications, which is a pronounced departure from the standard which he announced for a divided court in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Insofar as *Gertz* is parallel to *Rosenbloom,* three Justices can be said to have switched their votes in the intervening period: Mr. Justice Blackmun, Mr. Justice White, and the Chief Justice.

[2]The district court held that under Illinois law an untruthful charge of being a Communist was libelous per se. In addition, since it would harm a lawyer in his profession, it was libelous per se because it would be slanderous per se. *Gertz v. Robert Welch, Inc.,* 306 F.Supp. 310 (N.D. Ill. 1969). The trial court also held that since the defamation was libelous per se, there was no need for the plaintiff to plead or prove special damages or actual pecuniary loss. *See generally W. Prosser, The Law of Torts* § 112 (4th ed. 1971).

basis of diversity of citizenship. The jury returned a verdict under a strict liability charge for $50,000. Thereafter, the trial court granted a defense motion for judgment notwithstanding the verdict on the ground that the plaintiff, although not a public figure, was prohibited from recovery because the article involved a public issue. The trial court concluded that the First Amendment barred recovery in the absence of a showing of falsity or reckless disregard for the truth and said that the evidence might show negligence, but would not support a finding of recklessness. The court of appeals affirmed the trial court. *Gertz v. Robert Welch, Inc.*, 471 F.2d 801 (7th Cir. 1972).

Although Chief Justice Burger and Mr. Justice White voted to reinstate the verdict in favor of Gertz, the majority, speaking through Mr. Justice Powell, concluded that the *New York Times* standard was not applicable and that the trial court erred in entering judgment for the defendant. A new trial was ordered because the jury was allowed to impose liability without fault and was permitted to presume damages without proof of injury.

*Gertz v. Robert Welch, Inc.* stands for the following propositions: First, that the recklessness standard of liability must be applied, as a matter of constitutional law, when public officials or public figures assert that they have been subjected to a defamatory publication. Second, even for the defamation of a private individual, the states are not at liberty to impose strict liability upon the news media, but may protect a private individual by imposing any standard of care except liability without fault. Third, punitive or presumed damages can be recovered, regardless of whether the plaintiff is a public or private figure, only if recklessness is established. Damages, however, under the negligence concept enunciated in *Gertz,* are limited to actual injury, which may encompass all normal tort damages, including humiliation and suffering.

Thus, with *Gertz* as the best lighthouse which is available to guide us through the constitutional fog, we review the Colorado Constitution for further guidance. Article II, Section 10 of the Colorado Constitution buttresses implementation of Harlan's negligence standard in libel cases of this type and states:

"*Freedom of speech and press.* — No law shall be passed impairing the freedom of speech; every person shall be free to speak,

write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact.''

The Colorado Constitution not only guarantees free speech and a free press, but also fixes responsibility for abuse. *See Cooper v. People ex rel. Wyatt,* 13 Colo. 337, 22 P. 790, 6 L.R.A. 430 (1889); Campbell, *Libel as a Limitation on Newspaper Publications,* 25 Rocky Mtn. L. Rev. 279 (1953); Van Cise, *The Law of Libel in Colorado,* 28 Dicta 121 (1951).

The citizens of Colorado have a cherished and historic right to redress for damages caused by false and defamatory publications. Laws of Colorado (1861) p. 35; 2 Mills Ann. Stat. § 1889 (1926); *Byers v. Martin,* 2 Colo. 605, 25 Am. Rep. 755 (1875). Colorado's proprietary right to protect its citizenry from libelous abuse was recognized in the *Gertz* case by quoting from Mr. Justice Potter Stewart's opinion in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). In *Rosenblatt,* the right of an individual to protection of his own good name was said to reflect:

''[N]o more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.''

The genesis of the law of defamation was strict liability. *W. Prosser, The Law of Torts* 773 (4th ed. 1971); *Restatement of Torts* § 559 (1938); 1 *Harper and James, The Law of Torts* § 5.1, at 349-350 (1956); Veeder, *The History and Theory of the Law of Defamation,* 3 Colum. L. Rev. 546 (1903). However, the evolution of the law of defamation has watered down the strict liability concept. *But see* the dissenting opinions of Mr. Chief Justice Burger and Mr. Justice White in *Gertz v. Robert Welch, Inc., supra,* which approve of the strict liability standard.

It is necessary to balance the unrestricted right to publish matters of public interest against the right of an individual to be

protected against negligently published false and defamatory statements. The right of the public to know has the corollary that the right to know includes the right to know the truth. No license should exist to publish false, defamatory statements. The Supreme Court, although recognizing the publishing business as falling within the ambit of the First Amendment, has never suggested that the constitutional right of free speech gives an individual any immunity from liability for either libel or slander.

Our founders, in creating three branches of government, deliberately created an internally competitive system. As Mr. Justice Brandeis said in *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (dissenting opinion): "The [founders'] purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." The primary purpose of the constitutional guarantee of a free press was a similar one: to create a fourth institution outside the government as an additional check on the three official branches. Moreover, the three governmental branches are subject to checks and balances, and the imposition of a standard of reasonable care on the news media does not restrict the freedom of the press, but only encourages good journalistic practice and professionalism. *See* Colorado Press Association Code of Ethics.

Mr. Justice White, in his concurring opinion in *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), said:

"The press is the servant, not the master, of the citizenry, and its freedom does not carry with it an unrestricted hunting license to prey on the ordinary citizen.

" 'In plain English, freedom carries with it responsibility even for the press; freedom of the press is not a freedom from responsibility for its exercise . . . .

" '. . . . Without . . . a lively sense of responsibility a free press may readily become a powerful instrument of injustice.' " Pennekamp v. Florida, 328 U.S. 331, 356, 365, 66 S.Ct. 1029, 1042, 90 L.Ed. 1295 (1946). (Frankfurter, J., concurring) (footnote omitted).

Accountability and liberty are not mutually exclusive.

"Accountability, like subjection of law, is not necessarily a net

subtraction from liberty . . . . The First Amendment was intended to guarantee free expression not to create a privileged industry.'' Commission on Freedom of the Press, A Free and Responsible Press 130 (1947).

As Mr. Justice Harlan said in *Rosenbloom v. Metromedia, Inc., supra:*

''I think we all agree on certain core propositions. First, as a general matter, the States have a perfectly legitimate interest, exercised in a variety of ways, in redressing and preventing careless conduct, no matter who is responsible for it, that inflicts actual, measurable injury upon individual citizens. Secondly, there is no identifiable value worthy of constitutional protection in the publication of falsehoods. Third, although libel law provides that truth is a complete defense, that principle, standing alone, is insufficient to satisfy the constitutional interest in freedom of speech and press. For we have recognized that it is inevitable that there will be 'some error in the situation presented in free debate.' Time, Inc. v. Hill, 385 U.S. 374, 406, 87 S.Ct. 534, 551, 17 L.Ed.2d 456 (1967) (opinion of this writer), a process that needs 'breathing space,' NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963), to flourish, and that 'putting to the preexisting prejudices of a jury the determination of what is ''true'' may effectively institute a system of censorship.' Time, Inc. v. Hill, *supra,* at 406, 87 S.Ct., at 551.''

A responsible and professional news media requires no greater protection than that afforded by the negligence test. Mr. Justice Harlan, in his *Rosenbloom* dissent, which set forth a standard which was approved by five members of the Court in *Gertz,* and disapproved by two members of the Court as being contrary to the recognized strict liability concept, reasoned as follows:

''To begin, it does no violence, in my judgment, to the value of freedom of speech and press to impose a duty of reasonable care upon those who would exercise these freedoms. I do not think it can be gainsaid that the States have a substantial interest in encouraging speakers to carefully seek the truth before they communicate, as well as in compensating persons actually harmed by false descriptions of their personal behavior. Additionally, the burden of acting reasonably in taking action that may produce

adverse consequences for others is one generally placed upon all in our society. Thus, history itself belies the argument that a speaker must somehow be freed of the ordinary constraints of acting with reasonable care in order to contribute to the public good while, for example, doctors, accountants, and architects have constantly performed within such bounds.''

The dissent of Mr. Justice Harlan also offers the following logic for the negligence test:

''[W]here the purpose and effect of the law are to redress actual and measurable injury to private individuals that was reasonably foreseeable as a result of the publication, there is no necessary conflict with the values of freedom of speech. Just as an automobile negligently driven can cost a person his physical and mental wellbeing and the fruits of his labor, so can a printing press negligently set. While the First Amendment protects the press from the imposition of special liabilities upon it, '[t]o exempt a publisher, because of the nature of his calling, from an imposition generally exacted from other members of the community, would be to extend a protection not required by the constitutional guarantee.' Curtis Publishing Co. v. Butts, 388 U.S. 130, 160, 87 S.Ct. 1975, 1994, 18 L.Ed.2d 1094 (1967) (opinion of this writer). A business 'is not immune from regulation because it is an agency of the press. The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.' Associated Press v. NLRB, 301 U.S. 103, 132-133, 57 S.Ct. 650, 656, 81 L.Ed. 953 (1937). That the damage has been inflicted by words rather than other instrumentalities cannot insulate it from liability. States may legitimately be required to use finer regulatory tools where dealing with 'speech,' but they are not wholly disabled from exacting compensation for its measurable adverse consequences. If this is not so, it is difficult to understand why governments may, for example, proscribe 'misleading' advertising practices or specify what is 'true' in the dissemination of consumer credit advertisements.''

The clash in this case is between the right of the news media to report matters of general interest and the right of a private individual to maintain a reputation unsullied by false and defamatory comments by the news media. When these interests are in con-

flict, the courts must balance both interests and endeavor to reach an accommodation. The failing which is evident in the majority opinion is that the *Rosenbloom* test does not achieve a balance or an accommodation. The majority opinion fully implements the interest of the press, but does not take the private citizen's interest into account. The recklessness standard which the majority has adopted may require a plaintiff in a libel action, where matters of public interest are involved, to establish that the news media had a conscious awareness of probable falsity if recovery is to be allowed, even though the majority has elected not to follow *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), which was reaffirmed in *Gertz*. Reckless disregard as a standard, when stripped of the interpretation afforded by *St. Amant v. Thompson, supra*, probably means gross negligence, but certainly does not provide a settled test. *See Coffman v. Godsoe*, 142 Colo. 575, 351 P.2d 808 (1960); *Fanstiel v. Wright*, 122 Colo. 451, 222 P.2d 1001 (1950).

As I view the issue, the public official or public figure stands on an entirely different level than the involuntary news figure — the private citizen — who is defamed in a publication because the news media deems a matter to be of public interest. The private citizen has no opportunity to rebut the false charges in any effective way. It is doubtful that a retraction would reach the same group that heard or saw the initial publication, because retractions tend to have less meaning and are printed with less fervor than the initial news release. A reasonable balance between the right of the news media under the First Amendment and the right of the private citizen is the negligence test. In my view, the law of Colorado should not be so radically changed by this court from a concept of strict liability, in cases of this type, to a standard that, in effect, establishes no liability for a private citizen who is defamed by the news media.

The First Amendment should not be read as a license for irresponsibility by the news media. By reason of the services rendered by the news media, a defeasible privilege is granted when public officials or public figures are involved, but the reasons for such a privilege cease to exist when a private citizen is involved. To extend the privilege granted the news media in their dealings with public officials or public figures to private citizens, who are

captured by the news potential of their private experiences, is to create a fundamental unfairness.

The distinction which the majority has made and the definition of a matter of public interest or general concern is such that a definition is impossible, and implementation of the standard will only result in the destruction of a private citizen's right to recover for damages which he has suffered at the hands of the news media. The remedy of a libel action is the sole practical recourse which a private citizen has to secure an accounting for false and defamatory statements which are published. Even a libel action, the single arrow in a citizen's quiver, is of attenuated efficacy, as Professor Thomas I. Emerson points out:

"The impact of libel laws on the system of free expression has also been limited by the practical obstacles to maintaining a successful suit. Litigation is likely to be protracted. Delay is sure. Results are uncertain. Damages are speculative. Attitudes of judges, lawyers and the public all tend to be unfavorable." Emerson, The System of Freedom of Expression (1970), p. 519.

Experience with libel actions has taught us that the plaintiff is always on a perilous course. He exposes himself to accelerated vituperation and public exposure when he attempts to vindicate and protect his sullied reputation. In this case, the editor published material provided by the reporter and published stories relating to the litigation, rehashed the contents of the original stories, and pointed out the service that the defendant had rendered to the community in exposing the acts committed by the plaintiff. The public interest generated by the media in this case catapulted a local incident into the republication of the same allegations in a national antique magazine.

MR. JUSTICE LEE authorizes me to say that he joins me in this specially concurring and dissenting opinion.